# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

|  |  |
|---|---|
| DRAKES LANDING ASSOCIATES, L.P., MICHAEL DAVIS, EDUCATIONAL TESTING SERVICE, POTENCIA VENTURES, ZEPHYR PEACOCK INDIA FUND III LIMITED, ZEPHYR MANT RA LLC, ZEPHYR PEACOCK INDIA III FUND, Ai8 VENTURES FUND II, L.P., KNOTT PARTNERS, LP, KLAAS ELSINGA, UNIPLAN CONSULTING, LLC,<br><br>    Plaintiffs,<br><br>        v.<br><br>TILDEN PARK CAPITAL MANAGEMENT, L.P., a Delaware limited partnership, KING STREET CAPITAL, L.P. a Delaware limited partnership, ROBERT PARTLOW, PHILLIP RIESE, MANOLO SANCHEZ, and MPOWER FINANCING, PBC, a Delaware corporation,<br><br>    Defendants. | C.A. No. 2025-0898-NAC |

## OPINION

Date Submitted: April 27, 2026
Date Decided: July 29, 2026

David A. Jenkins, Jason Z. Miller, SMITH, KATZENSTEIN & JENKINS LLP; *Attorneys for Plaintiff.*

Sarah R. Martin, Bryan T. Reed, GREENBERG TRAURIG, LLP, Wilmington, Delaware; *Counsel for Defendant MPower Financing, PBC.*

Brian C. Ralston, Ryan M. Ellingson, POTTER ANDERSON & CORROON, Wilmington, Delaware; *Counsel for Defendants Robert Partlow, Phillip Riese, and Manolo Sanchez.*

Martin S. Lessner, Jason W. Rigby, YOUNG CONAWAY STARGATT & TAYLOR, LLP, Wilmington, Delaware; Michael C. Keats, FRIED, FRANK, HARRIS, SHRIVER & JACOBSON LLP, New York, New York; Katherine L. St. Romain, FRIED, FRANK, HARRIS, SHRIVER & JACOBSON LLP, Washington, DC; *Counsel for Defendant King Street Capital, L.P.*

John P. DiTomo, Jialu Zou, MORRIS, NICHOLS, ARSHT & TUNNELL LLP, Wilmington, Delaware; Richard S. Horvath, Jr., DECHERT LLP, San Francisco, California; Michael H. McGinley, DECHERT LLP, Philadelphia, Pennsylvania; *Counsel for Defendant Tilden Park Capital Management, L.P.*

**COOK, V.C.**

Two of a public benefit corporation's lenders proposed a financing transaction that would provide the company with $20 million in urgently needed financing. As part of the financing, the debt owed by the company to the two lenders would convert into equity, increasing the lenders' stock holdings from around 25% to nearly 85%, and diluting the other stockholders. The public benefit corporation appointed an independent and disinterested special committee to evaluate the transaction. The special committee in turn retained independent legal and financial advisors and ultimately approved the deal.

This case presents an issue of first impression: how *Revlon* and its progeny apply, if at all, to the board of a public benefit corporation navigating a change-of-control transaction. The answer to that question depends on whether one understands *Revlon* as imposing a standard of conduct (obtain the best price reasonably available) or a standard of review (enhanced scrutiny). Delaware decisions are less than clear on this issue. Directors of public benefit corporations are statutorily required to balance stockholders' pecuniary interests with other considerations, in tension with *Revlon*'s singular focus on maximizing price. I conclude that *Revlon* does not impose a standard of conduct on public benefit corporation directors, but that its underlying standard of review—enhanced scrutiny, which I will call "PBC" enhanced scrutiny—may still apply. I need not decide, however, whether that standard governs the outcome here because Plaintiffs have failed to plead facts sufficient to rebut the statutory safe harbor in Section 365(b) of the Delaware General Corporation Law ("DGCL").

Plaintiffs, current and former stockholders of the public benefit corporation, brought this action against the special committee for breach of fiduciary duty and against the two lenders for aiding and abetting that breach. Because the safe harbor protects the special committee's decision, both claims must be dismissed. Defendants' motion to dismiss is granted, and the Complaint is dismissed with prejudice.

## I.     FACTUAL BACKGROUND

The facts are drawn from the Verified Complaint for Injunctive Relief ("Complaint").[1] At this procedural stage, the Court credits the Complaint's well-pled allegations and draws all reasonable inferences in Plaintiffs' favor. The Court also considers documents incorporated by reference in the Complaint.

### A.     MPower Faces a Need for Short-Term Financing

MPower Financing, PBC ("MPower" or the "Company") is a Delaware public benefit corporation described as "the leader for international student financing in North America."[2] The Company's mission is to provide international students with the opportunity to attend postsecondary education in the United States.[3] To finance these endeavors, MPower raises funds from banks and other lenders.[4] Since its

[1] Citations in the form "Compl. ¶ ___" refer to paragraphs of the Verified Complaint for Injunctive Relief, which is the operative pleading. Dkt. 1. Citations in the form "Defs. OB Ex. ___ at ___" refer to exhibits Defendants filed in support of their Motion to Dismiss. Dkt. 31.

[2] Compl. ¶ 3.

[3] *Id.*

[4] *Id.*

inception, the Company has issued more than $600 million in loans to qualified international students.[5]

In late 2024, the Company appeared to be on the way to profitability. Gross revenues had increased, along with the number of loan approvals from potential financiers.[6] But at the beginning of 2025, the Company found itself in a short-term financial pinch. Under its existing debt covenants, MPower was required to have a minimum cash balance of $17 million by January 31, 2025.[7] The Company had previously sought to raise equity capital toward the end of 2025 to meet this requirement, but these efforts proved unfruitful.[8]

## B. The Proposed Term Sheet from Tilden Park and King Street

On January 20, 2025, in response to MPower's urgent need for capital, Defendants Tilden Park Management, L.P. ("Tilden Park") and King Street Capital, L.P. ("King Street," and, together with Tilden Park, the "Funds") jointly sent a proposed term sheet to the Company, which offered $15 million in immediate financing.[9] On January 25, 2025, MPower's CEO, Manu Smadja, responded to the Funds' term sheet with minor comments.[10]

---

[5] *Id.*

[6] *Id.* ¶ 6.

[7] *Id.* ¶ 8.

[8] *Id.* ¶ 7. In October 2024, the Company appointed Compass Point, an investment bank, to raise up to $100 million in equity capital at more than $20 per share. *Id.*

[9] *Id.* ¶ 9.

[10] *Id.*

The Funds were no strangers to MPower. Both were major lenders to the Company, collectively holding nearly $109 million of MPower's debt.[11] The Funds also owned 25.5% of the Company's common stock, in aggregate.[12] Tilden Park had two designees on the MPower board of directors ("Board"): Samuel Alcoff and Christopher Gamatoni.[13]

On January 30, just one day before the compliance deadline for the debt covenants, the Funds presented a modified term sheet to the Company.[14] The new term sheet raised the amount of financing to $20 million, and included a conversion option through which the Funds could convert into equity the nearly $109 million of debt owed to the Funds at $2.04 per share.[15] Upon conversion of the debt into equity, the Funds would collectively own nearly 85% of the Company's stock.[16] The conversion price also represented a significant discount when compared to MPower's most recent financing round from nearly four years earlier in July 2021—which valued the Company's stock price at $15.50 per share.[17]

---

[11] *Id.* ¶ 5.

[12] *Id.*

[13] *Id.* King Street did not have any board designees during the relevant time period.

[14] *Id.* ¶ 10.

[15] *Id.* The final term sheet ultimately increased the conversion price to $2.25 per share.

[16] *Id.*

[17] *Id.*

On January 31, the Board convened and approved the term sheet on a non-exclusive basis.[18] The Tilden Park designees recused themselves from the vote.[19] During that meeting, one director, Phillip Reise, opined that any dilutive transaction should be subject to stockholder approval.[20]

## C.  MPower's Board Forms a Special Committee

In February 2025, the Board resolved to appoint a three-person special committee to consider the Funds' term sheet.[21] The committee consisted of Defendants Robert Partlow, Phillip Reise, and Manolo Sanchez (the "Special Committee").[22] All three members of the Special Committee were disinterested directors on the MPower Board.[23] An attorney from the Company's counsel at Greenberg Traurig recommended that the Board obtain stockholder approval of the proposed transaction.[24] CEO Manu Smadja concurred.[25] But not all were in

---

[18] *Id.* ¶ 11.

[19] *Id.*

[20] *Id.*

[21] *Id.* ¶ 12.

[22] *Id.*

[23] Plaintiffs concede that the Special Committee members were disinterested and independent directors. *See* Dkt. 30, Transcript of 8/21/2025 Telephonic Oral Argument and Ruling of the Court on Plaintiffs' Motion for Expedited Proceedings ("MTE Transcript"), at 34; Dkt. 45, Transcript of Oral Argument on Defendants' Motion to Dismiss Held Via Zoom ("MTD Transcript") at 48:9–23.

[24] Compl. ¶ 12.

[25] *Id.*

agreement. Samuel Alcoff, a Tilden Park designee, objected to a stockholder vote and recommended that the Special Committee hire its own legal counsel.[26]

The Special Committee hired Potter Anderson & Corroon LLP as its counsel and Gordian Capital ("Gordian") as its financial advisor.[27] The Complaint does not allege that either advisor was interested in the Financing Transaction or beholden to the Funds or Tilden Park's Board designees. The Special Committee instructed Gordian "to search for deals for the Company that raised capital in an amount equivalent to Tilden Park's and King Street's proposal, but with much less dilution to the other stockholders."[28] On March 6, the Special Committee opened a data room to interested third parties, with term sheets due by March 15.[29] It is unclear from the record how many offers were submitted during the pendency of the bidding process. Plaintiffs claim that Gordian "did not do a thorough job," including by failing to approach strategic investors such as Sallie Mae, Navient, Sofi, or Prodigy.[30]

During the bidding process, a group of existing MPower stockholders approached Gordian with an offer to raise $20 million in financing as an alternative

---

[26] *Id.* ¶ 13.

[27] *Id.*

[28] *Id.* ¶ 14.

[29] *Id.*

[30] *Id.*

6

to the Funds' term sheet.[31]  The Complaint does not provide any details about this offer or its material terms.[32]  Gordian rejected the stockholder group's advance.[33]

On March 17 and 20, two groups of stockholders—collectively owning more than 50% of MPower stock—sent letters to the Board objecting to the proposed transaction and requesting that the matter be put to a stockholder vote.[34]  No stockholder vote was ever held, and the Special Committee approved the proposed transaction on March 28.[35]

## D.    The Financing Transaction Goes Forward

On March 28, 2025, following Special Committee approval, the MPower Board entered into an Exchange Agreement with the Funds through which the Funds would lend the Company $28,125,000 through a secured promissory note (the "Financing Transaction").[36]  The same day, the Funds also entered into a Governance Agreement

---

[31] *Id.* ¶ 18.

[32] In their answering brief, Plaintiffs argue that the stockholder group's alternative offer was "on terms that would not entail the same dilutive effects as the Transaction."  Pls. AB at 10.  Plaintiffs cite to paragraph 18 of the Complaint in support, which says nothing about the terms of the alternative proposal or its dilutive effects.  Compl. ¶ 18 ("A group of existing MPower stockholders approached Gordian with an offer to raise $20 million, but Gordian rebuffed that effort.").  Plaintiffs cannot supplement their Complaint through their answering brief.  *See MCG Cap. Corp. v. Maginn*, 2010 WL 1782271, at *5 (Del. Ch. May 4, 2010) (explaining that a plaintiff "is bound to the factual allegations contained in its complaint" and "cannot supplement the complaint through its brief"); *Parseghian ex rel. Gregory J. Parseghian Revocable Tr. v. Frequency Therapeutics, Inc.*, 2022 WL 2208899, at *11 n.82 (Del. Ch. June 21, 2022) ("Delaware law does not permit plaintiffs to amend their complaint through briefing.").  And Plaintiffs' argument that the terms were less dilutive is conclusory.

[33] Compl. ¶ 18.

[34] *Id.* ¶ 22.

[35] *Id.* ¶ 23.

[36] *Id.*; Defs. OB Exs. 4, 5.

with the Company.[37]  Under the Governance Agreement's provisions, Tilden Park is entitled to appoint four directors, and King Street is entitled to appoint three directors to the Board.[38]  The Governance Agreement also requires written consent from both Tilden Park and King Street before MPower may (i) issue additional stock, (ii) incur additional debt, (iii) enter into a merger or recapitalization, (iv) change corporate documents; (v) change board size; (vi) hire or fire management employees; or (vii) commence a bankruptcy proceeding.[39]

Plaintiffs' chief grievance with the Financing Transaction, however, is the significant dilution of existing stockholder equity.  Upon completion of the Financing Transaction, the Funds would collectively own approximately 85% of MPower stock.[40]

E.    **Procedural History**

Plaintiffs Drakes Landing Associates, L.P., Michael Davis, Educational Testing Service, Potencia Ventures, Zephyr Peacock India Fund III Limited, Zephyr Mantra LLC, Zephyr Peacock India III Fund, Ai8 Ventures Fund II, L.P., Knott Partners, LP, Klaas Elsinga, and UniPlan Consulting LLC are holders of MPower

---

[37] Compl. ¶ 20.

[38] *Id.*

[39] *Id.*

[40] *Id.* ¶ 19.  Pursuant to the Exchange Agreement, the conversion date for the swap is triggered on the earlier of (i) December 31, 2025 or (ii) the date on which MPower raises $25 million through the issuance of stock.  *See id.* ¶ 20; Def. OB Ex. 5 at 13.  The record is unclear as to whether the conversion occurred as of the date of this ruling, and the parties have not represented one way or the other.

common stock.[41]  In aggregate, Plaintiffs own nearly 30% of the Company's common stock, though the Financing Transaction would significantly reduce this figure.[42]

Plaintiffs filed the Complaint in this action on August 6, 2025.[43]  In the Complaint, Plaintiffs assert a claim for breach of fiduciary duty against the Special Committee (Count I), along with a secondary aiding-and-abetting claim against the Funds (Count II).  Plaintiffs also seek injunctive relief against MPower and the Special Committee members (Count III).

Plaintiffs sought expedition of these proceedings.  On August 21, the Court denied Plaintiffs' request to expedite.[44]

On September 17, the Company, the Funds, and the Special Committee members (collectively, "Defendants") jointly moved to dismiss the Complaint under Court of Chancery Rule 12(b)(6) ("Motion").[45]  The Court heard argument on Defendants' Motion on April 27, 2026.[46]  During oral argument, Plaintiffs voluntarily dismissed Count III.[47]  Therefore, only Counts I and II remain.  The Court concludes

---

[41] Compl. ¶ 2.

[42] *Id.* ¶ 10 ("Upon full conversion of the debt into equity, Tilden Park and King Street jointly would own 85% of the Company's stock, and the other stockholders would be diluted from 74.5% to 15% of the company's equity.").

[43] Dkt. 1.

[44] Dkt. 24.

[45] Dkt. 31.

[46] Dkt. 44.

[47] MTD Transcript at 50:8–16.

9

that Plaintiffs have failed to state a claim on both Counts. Accordingly, the Complaint is dismissed with prejudice.

## II. LEGAL ANALYSIS

"The standards governing a motion to dismiss for failure to state a claim are well settled: (i) all well-pleaded factual allegations are accepted as true; (ii) even vague allegations are 'well-pleaded' if they give the opposing party notice of the claim; (iii) the Court must draw all reasonable inferences in favor of the non-moving party; and (i[v]) dismissal is inappropriate unless the 'plaintiff would not be entitled to recover under any reasonably conceivable set of circumstances susceptible of proof.'"[48]

### A. Count I: Breach of Fiduciary Duty

"When determining whether corporate fiduciaries have breached their duties, Delaware corporate law distinguishes between the standard of conduct and the standard of review."[49] "The standard of conduct describes what directors are expected to do and is defined by the content of the duties of loyalty and care. The standard of review is the test that a court applies when evaluating whether directors have met the standard of conduct."[50]

---

[48] *Savor, Inc. v. FMR Corp.*, 812 A.2d 894, 896–97 (Del. 2002) (quoting *Kofron v. Amoco Chems. Corp.*, 441 A.2d 226, 227 (Del. 1982)).

[49] *Chen v. Howard-Anderson*, 87 A.3d 648, 666 (Del. Ch. 2014); *In re Trados Inc. S'holder Litig.*, 73 A.3d 17, 35 (Del. Ch. 2013) (same).

[50] *Trados*, 73 A.3d at 35–36.

### 1. The Standard of Conduct

"Delaware corporate law starts from the bedrock principle that '[t]he business and affairs of every corporation . . . shall be managed by or under the direction of a board of directors.'"[51] "When exercising their statutory responsibility, the standard of conduct requires that directors [of a traditional corporation] seek 'to promote the value of the corporation for the benefit of its stockholders.'"[52] Indeed, "[t]he fiduciary duties owed by directors of a [traditional] Delaware corporation require the directors to seek to maximize the value of the corporation over the long-term for the benefit of the stockholders as residual claimants to the value created by the specific firm that the directors serve." [53] Importantly, in the traditional corporation context, "stockholders' best interest must always, within legal limits, be the end. Other constituencies may be considered only instrumentally to advance that end."[54]

The standard of conduct for directors of public benefit corporations is slightly different. Section 365 of the DGCL governs the fiduciary duties of directors of public benefit corporations. Section 365(a) provides:

> The board of directors shall manage the business and affairs of the public benefit corporation in a manner that balances the pecuniary interests of the stockholders, the best interests of those materially

---

[51] *Id.* (quoting 8 *Del. C.* § 141(a)).

[52] *Id.* (quoting *eBay Domestic Hldgs., Inc. v. Newmark*, 16 A.3d 1, 34 (Del. Ch. 2010)).

[53] *McRitchie v. Zuckerberg*, 315 A.3d 518, 564 (Del. Ch. 2024).

[54] *Trados*, 73 A.3d at 37 (quoting Leo E. Strine, Jr., *Our Continuing Struggle with the Idea that For–Profit Corporations Seek Profit*, 47 WAKE FOREST L. REV. 135, 147 n.34 (2012)) (internal quotation marks omitted).

affected by the corporation's conduct, and the specific public benefit or public benefits identified in its certificate of incorporation.[55]

In other words, while directors of traditional corporations must perform their fiduciary duties with the sole focus of stockholder wealth maximization, directors of public benefit corporations must balance stockholder pecuniary interests with the interests of other stakeholders.

### 2.    The Standard of Review

"Delaware has three tiers of review for evaluating director decision-making: the business judgment rule, enhanced scrutiny, and entire fairness."[56]   For transactions involving a change of control, the presumptive standard of review is enhanced scrutiny under *Revlon* and its progeny.[57]  "Enhanced scrutiny applies in this setting because 'the potential sale of a corporation has enormous implications for corporate managers and advisors, and a range of human motivations, including but by no means limited to greed, can inspire fiduciaries and their advisors to be less than faithful.'"[58]

---

[55] 8 *Del. C.* § 365(a).  *See also id.* § 362(a) ("[A] public benefit corporation shall be managed in a manner that balances the stockholders' pecuniary interests, the best interests of those materially affected by the corporation's conduct, and the public benefit or public benefits identified in its certificate of incorporation."); Leo E. Strine, Jr., *Making It Easier for Directors to "Do the Right Thing"?*, 4 HARV. BUS. L. REV. 235, 243 (2014) ("This general provision [referring to § 362(a)] is matched by a more specific one directed to the duties of directors [referring to § 365(a)] . . . .").

[56] *Reis v. Hazelett Strip-Casting Corp.*, 28 A.3d 442, 457 (Del. Ch. 2011).

[57] *Firefighters' Pension Sys. of City of Kansas City, Missouri Trust v. Presidio, Inc.*, 251 A.3d 212, 249 (Del. Ch. 2021); *Paramount Commc'ns Inc. v. QVC Network Inc.*, 637 A.2d 34, 45 (Del. 1994).

[58] *Presidio*, 251 A.3d at 249 (quoting *In re El Paso Corp. S'holder Litig.*, 41 A.3d 432, 439 (Del. Ch. 2012)).

12

"Enhanced scrutiny is Delaware's intermediate standard of review."[59] Under enhanced scrutiny, the Court "examines 'the reasonableness of the end that directors chose to pursue, the path that they took to get there, and the fit between the means and the end."[60] This "reasonableness standard permits a reviewing court to address inequitable action even when directors may have subjectively believed that they were acting properly," but "does not permit a reviewing court to freely substitute its own judgment for the directors' judgment."[61] "Enhanced scrutiny 'is not a license for law-trained courts to second-guess reasonable, but debatable, tactical choices that directors have made in good faith.'"[62]

The parties do not appear to dispute that the Financing Transaction is a change-of-control transaction that, but for MPower's status as a public benefit corporation, would be subject to enhanced scrutiny under *Revlon*. The parties disagree, however, on whether and how MPower's status as a public benefit corporation affects the application of *Revlon*.

As explained above, Delaware corporation law distinguishes between the standard of conduct and the standard of review. Delaware decisions are arguably

---

[59] *Young Women's Christian Assoc. of Rochester and Monroe Cnty. v. Hatteras Funds, LP* ("*YWCA*"), 356 A.3d 459, 488 (Del. Ch. 2026).

[60] *Id.* at 489; *see also In re Dollar Thrifty S'holder Litig.*, 14 A.3d 573, 595–96 (Del. Ch. 2010) ("[A]t bottom *Revlon* is a test of reasonableness; directors are generally free to select the path to value maximization, so long as they choose a reasonable route to get there."); *QVC*, 637 A.2d at 45 ("The courts will apply enhanced scrutiny [in sale of control context] to ensure the directors have acted reasonably.").

[61] *Presidio*, 251 A.3d at 250 (quotations and citations omitted).

[62] *Id.* (quoting *In re Toys "R" Us, Inc. S'holder Litig.*, 877 A.2d 975, 1000 (Del. Ch. 2005)).

13

unclear as to whether *Revlon* imposes a standard of conduct or a standard of review or both.[63] On the one hand, the Delaware Supreme Court has said that "*Revlon* neither creates a new type of fiduciary duty in the sale-of-control context nor alters the nature of the fiduciary duties that generally apply."[64] On the other hand, the Court continues to say that "[t]here is only one *Revlon* duty—to '[get] the best price for the stockholders at a sale of the company.'"[65]

---

[63] *See* J. Travis Laster, *Revlon Is A Standard of Review: Why It's True and What It Means*, 19 FORDHAM J. CORP. & FIN. L. 5, 25–33 (2013) (explaining the existing confusion in Delaware decisions applying *Revlon* as a duty to get the best price as opposed to requiring enhanced scrutiny review); *In re USG Corp. S'holder Litig.*, 2020 WL 5126671, at *28 (Del. Aug. 31, 2020) ("*Revlon* 'duties' should not be confused with the *Revlon* standard of review, applicable principally outside the damages context, under which directors must act reasonably."); *see also id.* ("Describing the duties of directors in way of a control transaction as '*Revlon* duties,' to my mind, is something of a misnomer; the fiduciary duties are loyalty and care, in any situation[.]").

[64] *Malpiede v. Townson*, 780 A.2d 1075, 1084 (Del. 2001); *see also Lyondell Chem. Co. v. Ryan*, 970 A.2d 235, 243 (Del. 2009) ("[T]here are no legally prescribed steps that directors must follow to satisfy their *Revlon* duties."); *QVC*, 637 A.2d at 43 ("The directors' fiduciary duties in a sale of control context are those which generally attach. In short, 'the directors must act in accordance with their fundamental duties of care and loyalty.'") (citation omitted); *Barkan v. Amsted Indus., Inc.*, 567 A.2d 1279, 1286 (Del. 1989) ("[T]he basic teaching of [*Revlon* and *Unocal*] is simply that the directors must act in accordance with their fundamental duties of care and loyalty."); *Mills Acquisition Co. v. Macmillan, Inc.*, 559 A.2d 1261, 1288 (Del. 1989) ("Beyond [seeking the highest value reasonably attainable for stockholders], there are no special and distinct '*Revlon* duties.'"); *In re Lukens Inc. S'holders Litig.*, 757 A.2d 720, 731 (Del. Ch. 1999) ("'*Revlon* duties' refer only to a director's performance of his or her duties of care, good faith and loyalty in the unique factual circumstance of a sale of control over the corporate enterprise.").

[65] *Lyondell Chem.*, 970 A.2d at 242 (quoting *Revlon, Inc. v. MacAndrews & Forbes Holdings, Inc*, 506 A.2d 173, 182 (Del. 1986)); *see also QVC*, 637 A.2d at 43–44 ("The consequences of a sale of control impose special obligations on the directors of a corporation. . . . In the sale of control context, the directors must focus on one primary objective—to secure the transaction offering the best value reasonably available for the stockholders[.]"); *Dollar Thrifty*, 14 A.3d at 595 ("*Revlon* does not require that a board, in determining the value-maximizing transaction, follow any specific plan or roadmap in meeting its duty to take reasonable steps to secure—i.e., actually attain—the best immediate value.").

Defendants argue that *Revlon* is inapplicable because its sole focus on stockholder wealth maximization is inconsistent with Section 365(a)'s balancing requirement.[66] Construing *Revlon* as imposing a standard of conduct—that the board "get the best price for the stockholders at a sale of the company"[67]—I agree. To say that directors of a public benefit corporation "must perform [their] fiduciary duties in the service of [the] specific objective" of "maximizing the sale price of the enterprise,"[68] or that they "must focus on" that "primary objective[,]"[69] would be inconsistent with the public benefit corporation statute's requirement that directors consider and balance other interests against stockholder pecuniary interests.[70] Even

---

[66] Defendants' Reply Brief in Further Support of Their Motion to Dismiss (Dkt. 37) at 3–8.

[67] *Lyondell Chem.*, 970 A.2d at 242 (quotation marks and citation omitted).

[68] *Malpiede*, 780 A.2d at 1084.

[69] *QVC*, 637 A.2d at 44.

[70] *See* Strine, *supra* note 55, at 245 ("[O]ne of the most important consequences of the Delaware [public benefit corporation] statute is that it makes clear that the *Revlon* doctrine does not apply to benefit corporations. Under *Revlon* in the traditional public company context, a board of directors that has decided to sell the corporation in a change of control transaction must, within the discretion afforded it by positive regulatory law, sell the corporation to the bidder offering to pay the highest price to the company's stockholders. Because of that, when *Revlon* applies, a board cannot consider which bidder is likely to be the most responsible steward of the company's assets in terms of operating them in a manner that is in the best interests of the company's employees, customers, communities, the environment, or society generally. Dollars for stockholders is the only end that may be considered, assuming positive law provides no other barrier.") (citations omitted). *But see* Frederick H. Alexander et al., *M&A Under Delaware's Public Benefit Corporation Statute: A Hypothetical Tour*, 4 HARV. BUS. L. REV. 255, 271 (2014) ("It is possible that courts might continue to apply the heightened *Revlon* standard with respect to the total value achieved in a change of control transaction. Under this approach, even though the deferential 365(b) standard would apply to allocating and balancing value among the stockholders and public beneficiaries, a court might apply a reasonableness standard to the total value maximizing process."); *id.* at 270 ("We expect, however, that these [*Revlon*] precepts would operate differently in the case of a [public benefit corporation].").

Plaintiffs recognize that MPower's status as a public benefit corporation would require the Court to apply some "modified" version of *Revlon*.[71]

Plaintiffs argue that there is still room for *Revlon* to apply in the public benefit corporation context.[72] Construing *Revlon* as a standard of review, that is possible. The "enormous implications"[73] inherent in a change-of-control transaction do not vanish simply because a corporation is a public benefit corporation. To avoid confusion, one might refer to this type of application of enhanced scrutiny as "PBC" enhanced scrutiny, rather than *Revlon*.

Such an application of enhanced scrutiny to the decisions of directors of public benefit corporations might examine whether the directors' actions in balancing the interests required under Section 365(a) fell outside the range of reasonableness. As explained below, however, I need not reach this question because Plaintiffs have failed to plead facts sufficient to rebut the safe harbor in Section 365(b).[74]

---

[71] *See* Pls. AB at 19 ("Of course, the Court's commentary on the unwavering obligation to act solely for the benefit of stockholders could be modified here due to MPower's status as a public benefit corporation[.]").

[72] Pls. AB at 12–15.

[73] *El Paso*, 41 A.3d at 439.

[74] Even if I were to reach the enhanced scrutiny analysis, I would almost certainly conclude that Plaintiffs have not pled facts that would support a reasonable inference that the Special Committee acted unreasonably in balancing the interests in Section 365(a). Indeed, Plaintiffs do not even attempt to plead as much. Instead, Plaintiffs make the conclusory argument—for the first time in their answering brief—that no balancing occurred. Plaintiffs base this conclusion on the lack of any record that the Special Committee engaged in any balancing. This is an improper attempt by Plaintiffs to reallocate their pleading stage burden to Defendants. *See Malpiede*, 780 A.2d at 1084 ("Although the *Revlon* doctrine imposes enhanced judicial scrutiny of certain transactions involving a sale of control, it does not eliminate the requirement that plaintiffs plead sufficient facts to support the underlying claims for a breach of fiduciary duties in conducting the sale."). Additionally, Plaintiffs'

16

### 3.    Section 365(b)'s Safe Harbor

Defendants moved to dismiss Plaintiffs' breach of fiduciary duty claim under

Section 365(b) of the DGCL.  Section 365(b) is a statutory safe harbor for directors of

public benefit corporations.  That section provides, in relevant part:

> [W]ith respect to a decision implicating the balance requirement in subsection (a) of this section, [a director of a public benefit corporation] will be deemed to satisfy such director's fiduciary duties to stockholders and the corporation if such director's decision is both informed and disinterested and not such that no person of ordinary, sound judgment would approve.[75]

Plaintiffs bear the burden of pleading facts supporting a reasonable inference that

the requirements of the safe harbor were not satisfied.[76]  Plaintiffs have failed to do

so here.

### a.    Informed and Disinterested

Plaintiffs concede that the Special Committee members were disinterested and

independent.[77]  The question then becomes whether the Special Committee was

---

asserction that they do not have the record to plead a lack of balancing rings hollow, given Plaintiffs' failure to seek books and records under 8 *Del. C.* § 220.  *See Thermopylae Cap. P'rs, L.P. v. Simbol, Inc.*, 2016 WL 368170, at *17 (Del. Ch. Jan. 29, 2016) ("Plaintiff could have obtained pertinent facts through an action under Section 220, instead of suggesting that the Court speculate as to the existence of a claim.").

[75] 8 *Del. C.* § 365(b).

[76] *Ayers v. Foley*, --- A.3d ---, 2026 WL 1723538, at *14 n.168 (addressing a different safe harbor statute and explaining: "[t]he plaintiff bears the burden of pleading facts supporting a reasonable inference that Section 144's statutory requirements were not satisfied.").

[77] *See* MTE Transcript at 34; MTD Transcript at 48:9–23.

17

"informed." This is an undefined term in the statute,[78] so it "must be given [its] ordinary, common meaning."[79]

Under Delaware corporation law, "directors have a fiduciary obligation to 'inform themselves, prior to making a business decision, of all material information reasonably available to them.'"[80] "A director's duty to exercise an informed business judgment implicates the duty of care."[81] "For purposes of the standard of conduct, the duty of care requires that directors exercise reasonable care."[82]

For purposes of the standard of review, the level of care varies:

- When the business judgment rule applies, the level of carelessness is gross negligence.

---

[78] Section 365(a)'s use of the undefined term "informed" can be juxtaposed with the language employed in Section 144(a)(1)'s safe harbor. Under Section 144(a)(1), the approval of disinterested directors can act as a safe harbor for director- or officer-conflicted transactions if "[t]he material facts as to the director's or officer's relationship or interest and as to the act or transaction, including any involvement in the initiation, negotiation, or approval of the act or transaction, are disclosed or are known to all members of the board of directors or a committee of the board of directors[.]" 8 *Del. C.* § 144(a)(1). Section 144(a)(1) goes on to require that the disinterested directors' approval of the act or transaction be "in good faith and without gross negligence[.]" *Id.* In other words, Section 144(a)(1) supplies the information that must be disclosed to or known by the decision-making directors, and it provides the standard of review (business judgment) by requiring that the approval be "in good faith and without gross negligence." *See YWCA*, 356 A.3d at 490 (explaining that gross negligence is required to plead a breach of the duty of care where the business judgment rule applies). By contrast, Section 365(a) requires that directors be "informed" in their decision-making to satisfy the safe harbor, but does not provide the information that must be known by or disclosed to the directors or the standard of review that would apply to the Court's analysis of that requirement.

[79] *Oceanport Indus., Inc. v. Wilm. Stevedores, Inc.*, 636 A.2d 892, 900 (Del. 1994); *see also Kofron v. Amoco Chems. Corp.*, 441 A.2d 226, 230 (Del. 1982) ("When this Court is faced with a novel question of statutory construction, . . . we give the statutory words their commonly understood meanings.").

[80] *Aronson v. Lewis*, 473 A.2d 805, 812 (Del. 1984) (subsequent history omitted).

[81] *McMullin v. Beran*, 765 A.2d 910, 921 (Del. 2000).

[82] *YWCA*, 356 A.3d at 490 (citing *Aronson*, 473 A.2d at 812).

18

- When enhanced scrutiny applies, the level of carelessness is action that falls outside the range of reasonableness.

- When entire fairness applies, the level of carelessness is action resulting in a decisionmaking process that fails to satisfy the fair dealing dimension of the unitary entire fairness test.[83]

This begs the question of whether enhanced scrutiny applies to the Court's evaluation of the safe harbor's "informed" requirement where a change-of-control transaction is challenged.

Some might argue that enhanced scrutiny applies to the Court's analysis of the "informed" requirement because one "of the established situations in which enhanced scrutiny applies [is] present,"[84] *i.e.*, a change-of-control transaction.[85] Others may

---

[83] *Id.* (citations omitted).

[84] *In re McDonald's Corp. S'holder Deriv. Litig.*, 291 A.3d 652, 686 (Del. Ch. 2023) ("The analysis starts with the default standard of the business judgment rule. None of the established situations in which enhanced scrutiny applies are present in this case, rendering that standard inapplicable."); *see also In re Rural Metro Corp.*, 88 A.3d 54, 84 (Del. Ch. 2014) ("In this case, the Board approved a sale of Rural to Warburg for cash. This transactional context causes the standard of review to intensify from the business judgment rule to enhanced scrutiny."); *YWCA*, 356 A.3d at 488–89 ("Enhanced scrutiny applies to specific, recurring, and readily identifiable situations marked by two features. First, there is a distinct decision-making context where the realities of the situation can subtly undermine the decisions of even independent and disinterested fiduciaries. Second, the decision under review involves the directors intruding into a space where stockholders possess rights of their own. The directors' exercise of corporate power therefore raises questions about the allocations of authority within the entity and, from a theoretical perspective, implicates the principal-agent problem. The resulting scenarios call for an intermediate standard of review that examines 'the reasonableness of the end that the directors chose to pursue, the path that they took to get there, and the fit between the means and the end.'").

[85] *See Flannery v. Genomic Health, Inc.*, 2021 WL 3615540, at *12 (Del. Ch. Aug. 16, 2021) ("Delaware courts will move past the business judgment rule and review director conduct with enhanced scrutiny under *Revlon* when directors are confronted with a change of control transaction that presents the board with the opportunity to secure 'the best value reasonably available to the stockholders.'") (quoting *QVC*, 637 A.2d at 43); *Barkan*, 567 A.2d at 1286 ("We believe that the general principles announced in *Revlon*, *Unocal* [], and *Moran* [] govern this case and every case in which a fundamental change of corporate control occurs or is contemplated.").

19

say that applying enhanced scrutiny would defeat the safe harbor's purpose, which has been described as entitling directors to business judgment rule protection against liability for good faith balancing of interests.[86] Regardless of how one might answer this interesting question, Plaintiffs here have failed to plead facts supporting a reasonable inference that the Special Committee was not informed under either the business judgment rule or enhanced scrutiny.

Under the business judgment rule, Plaintiffs must plead facts supporting a reasonable inference that the Special Committee acted with gross negligence.[87] "In the corporate context, gross negligence has its own special meaning that is akin to recklessness."[88] Here, Plaintiffs concede that they have not pled facts supporting an inference of gross negligence.[89]

Under enhanced scrutiny, Plaintiffs must plead facts supporting a reasonable inference that the Special Committee's efforts to inform itself fell outside the range of reasonableness.[90] Even under this standard, Plaintiffs still fail. As explained

---

[86] *See* Strine, *supra* note 55, at 248 ("The board's good faith balancing of the interests of all constituencies would be entitled to the protection of the business judgment rule and would thus operate as a safe harbor against liability, as Section 365 of the Delaware statute makes explicit.") (citing 8 *Del. C.* § 365(b)).

[87] *McDonald's*, 291 A.3d at 679.

[88] *Id.*

[89] *See* MTD Transcript at 48:20–23 ("We do not believe we have gross negligence. We do not believe we have facts that would show gross negligence."); *see also* Pls. AB at 23 ("Defendants further argue that the viability of the Complaint depends on Plaintiffs pleading allegations that make it reasonably conceivable the Special Committee approved the Transaction in bad faith. . . . Once again, Plaintiffs agree.").

[90] *YWCA*, 356 A.3d at 490.

previously, directors of a public benefit corporation must consider and balance a broader scope of interests than their traditional corporation counterparts. It follows that to plead that directors of a public benefit corporation did not act reasonably to inform themselves, a plaintiff must plead facts supporting an inference that the directors did not do so as to the three interests they are required to consider and balance under Section 365(a).

Here, Plaintiffs do not even attempt to do so. The Complaint speaks only to the directors' alleged failure to do a "more thorough job" in canvasing the market to find a better deal. But this goes only to the stockholders' pecuniary interests, which is just one of the three interests identified in Section 365(a). Plaintiffs do not allege that the Special Committee failed to take steps to inform itself of the other interests it was required to balance.

Plaintiffs argue in their answering brief that no balancing occurred,[91] but that argument runs into two issues under well-established Delaware law: (1) Plaintiffs cannot amend their pleading through their answering brief;[92] and (2) Plaintiffs'

---

[91] Pls. AB at 2 ("Section 365(b), however, is not applicable on this motion to dismiss, because there is no record evidence that supports the Special Committee having engaged in any form of 'balancing' analysis when it approved the Transaction with Tilden Park and King Street."); *id.* at 14–15 ("The record does not show the Special Committee here engaged in *any* Section 365(a) 'balancing' analysis or reached *any* informed decision that accounted for the interests of all relevant constituencies."); *id.* at 15 ("Given the absence of a factual record supporting Defendants' invocation of the balancing requirement under Section 365(a), the safe harbor provided by Section 365(b) is unavailable here."); *id.* at 16 ("It is difficult to see how the Special Committee can be credited with 'balancing' the interests of various constituencies when the record contains no facts to substantiate that they balanced anything.").

[92] *See MCG Cap.*, 2010 WL 1782271, at *5; *Parseghian*, 2022 WL 2208899, at *11 n.82.

21

argument is entirely conclusory.[93] Plaintiffs could have sought books and records under Section 220 but opted not to.[94] As a result, they ask the Court to draw unreasonable inferences to fill the gaps in their pleading based on conclusory arguments in their answering brief. Even under the enhanced scrutiny standard of review, Plaintiffs bear the burden of pleading facts supporting their claim.[95] They have failed to do so here.

Plaintiffs have failed to plead facts supporting a reasonable inference that the Special Committee was not informed for purposes of Section 365(b).

### b. Waste

That leads to the final question under Section 365(b): whether it is reasonably conceivable that the Special Committee's decision was "such that no person of ordinary, sound judgment would approve."[96] This question sounds in waste.[97]

"Delaware sets a high standard for waste, which is 'extreme and rarely satisfied.' To constitute waste, '[t]he company would literally have to get nothing

---

[93] *Clinton v. Enterprise Rent-A-Car Co.*, 977 A.2d 892, 895 (Del. 2009) ("We do not, however, simply accept conclusory allegations unsupported by specific facts, nor do we draw unreasonable inferences in the plaintiff's favor."); *see also In re Santa Fe Pac. Corp. S'holder Litig.*, 669 A.2d 59, 65–66 (Del. 1995) ("Conclusory allegations will not be accepted as true without specific supporting factual allegations.").

[94] *See Thermopylae*, 2016 WL 368170, at *17.

[95] *See Malpiede*, 780 A.2d at 1084.

[96] 8 *Del. C.* § 365(b).

[97] *See Glazer v. Zapata Corp.*, 658 A.2d 176, 183 (Del. Ch. 1993) ("Directors are guilty of corporate waste, only when they authorize an exchange that is so one sided that no business person of ordinary, sound judgment could conclude that the corporation has received adequate consideration.").

22

whatsoever for what it gave.'"[98]  Plaintiffs do not assert, nor can they, that MPower received nothing from the Financing Transaction.  To the contrary, the Company received much-needed short-term financing.[99]  Instead, Plaintiffs quibble with the Special Committee's process.  But "mere disagreement cannot serve as grounds for imposing liability based on alleged breaches of fiduciary duty and waste."[100]

Plaintiffs do not even attempt to plead waste in the Complaint.  Nor do they address Defendants' arguments on that point in their briefing on the Motion.[101]  Plaintiffs have failed to plead facts sufficient to rebut Section 365(b)'s safe harbor.  Accordingly, the Special Committee is "deemed to satisfy [its] fiduciary duties[,]"[102] and Count I is dismissed.

*       *       *

The Special Committee members also moved for dismissal of Count I based on DGCL Section 144(a)(1)'s safe harbor[103] and, separately, the exculpation provision in MPower's charter.[104]  In summary, Section 144(a)(1) precludes equitable relief or an

---

[98] *In re Anaplan, Inc. S'holders Litig.*, 2024 WL 3086013, at *11 (Del. Ch. June 21, 2024), *aff'd*, 339 A.3d 694 (Del. 2025) (quoting *In re CBS Corp. Stockholder Class Action & Derivative Litig.*, 2021 WL 268779 (Del. Ch. Jan. 27, 2021), *as corrected* (Feb. 4, 2021)).

[99] Compl. ¶ 8 ("MPower needed short-term financing to come into compliance with its debt covenants[.]"); *id.* ¶ 10 (alleging the Funds' final term sheet raised the amount of financing to $20 million).

[100] *Brehm v. Eisner*, 746 A.2d 244, 266 (Del. 2000).

[101] Defs. OB at 16, 17, 19.

[102] 8 *Del. C.* § 365(b).

[103] Defs. OB at 19–26.

[104] *Id.* at 27; *id.* Ex. 1, Art. VIII.

23

award of damages against MPower's directors and officers if the Special Committee, among other things, authorized the Financing Transaction "in good faith[.]" [105] Plaintiffs acknowledge that their only argument against application of the safe harbor at this pleading stage is that the Special Committee acted in bad faith in approving the Financing Transaction. [106] Thus, the relevant question is whether Plaintiffs plead facts supporting a reasonable inference that the Special Committee authorized the Financing Transaction in bad faith. [107]

The same is true with respect to the Special Committee's exculpation defense. To state a claim for damages against the Special Committee members, Plaintiffs would need to plead that the Special Committee members breached their duty of loyalty. [108] Given their concession that the Special Committee members were disinterested and independent, Plaintiffs would need to plead that the Special Committee members acted in bad faith.

Although I need not reach this question, if pressed to do so, I would almost certainly conclude that Plaintiffs have failed to plead bad faith here. Boiled down, Plaintiffs argue that no balancing occurred. It is conceivable that a plaintiff could

---

[105] 8 *Del. C.* § 144(a)(1).

[106] *See* MTD Transcript at 48:9–23. *See also Lyondell Chem.*, 970 A.2d at 240 n.8 ("Our corporate decisions tend to use the terms 'bad faith' and 'failure to act in good faith' interchangeably.").

[107] *See Ayers*, 2026 WL 1723538, at *14 n.168 ("The plaintiff bears the burden of pleading facts supporting a reasonable inference that Section 144's statutory requirements were not satisfied.").

[108] *In re Cornerstone Therapeutics Inc. S'holder Litig.*, 115 A.3d 1173, 1175 (Del. 2015).

24

plead bad faith by alleging that the directors "utterly failed to attempt to" balance the interests prescribed by Section 365(a).[109]   But even then, the public benefit corporation statute expressly provides that failing to balance cannot constitute bad faith—at least for purposes of Section 102(b)(7)—absent a conflict of interest.[110] Regardless, Plaintiffs would still need to plead that the Special Committee did not engage in balancing.[111]

[109] *See Lyondell Chem.*, 970 A.2d at 244–45 ("Instead of questioning whether disinterested, independent directors did everything that they (arguably) should have done to obtain the best sale price, the inquiry should have been whether those directors utterly failed to attempt to obtain the best sale price.").

[110] 8 *Del. C.* § 365(c) ("In the absence of a conflict of interest, no failure to satisfy [Section 365(a)'s] balancing requirement shall, for purposes of § 102(b)(7) or § 145 of this title, constitute an act or omission not in good faith, or a breach of the duty of loyalty, unless the certificate of incorporation so provides."). Although Plaintiffs concede the Special Committee was disinterested and independent, Defendants do not raise Section 365(c). But, if the statutory "absence of a conflict of interest" text refers to the decision makers (*i.e.*, the Special Committee), then it would seem that Section 365(c) forecloses Plaintiffs' argument for non-exculpated bad faith as to the Special Committee members. And, if the text encompasses the entire Board, including non-decision-makers, it is still not clear that Plaintiffs have alleged a Board conflict. The Complaint does not use the word "conflict" or any variation thereof. Although the Complaint alleges that Tilden Park had two designees on the MPower Board, it does not allege that those directors held any position or financial interest in Tilden Park that would render them conflicted. Plaintiffs refer to Mr. Alcoff—one of Tilden Park's designees—as "conflicted" for the first time in their answering brief, based solely on Mr. Alcoff's designation. Pls. AB at 20. But designation by a party to a transaction alone does not result in a conflict. *See, e.g., Guilbeau v. Footprint Int'l Holdco, Inc.*, --- A.3d ---, 2026 WL 1329169, at *23 n.154 (Del. Ch. May 11, 2026) ("The plaintiffs challenge Daly's independence because he was ZenCap's designee, but that alone is not enough."); *Sciabacucchi v. Liberty Broadband Corp.*, 2022 WL 1301859, at *16 (Del. Ch. May 2, 2022) ("Delaware law does not recognize designee status as sufficient in itself to demonstrate a director's lack of independence as relates to the designating entity, and the presumption of independence continues to apply to designee directors, unless rebutted."). Because Defendants do not raise Section 365(c) in support of their exculpation argument, I do not address it further.

[111] *See Malpiede*, 780 A.2d at 1084; *see also Roofers Local 149 Pension Fund v. Fidelity Nat'l Fin., Inc.*, 2025 WL 1354973, at *7 (Del. Ch. May 9, 2025) (explaining that under the entire fairness standard of review, "a plaintiff must allege facts supporting a reasonable

Here, the Complaint alleges nothing about balancing. Plaintiffs argued that no balancing occurred for the first time in their answering brief.[112] As explained above, Plaintiffs cannot amend their Complaint through their answering brief, and, in any event, their argument is entirely conclusory. Plaintiffs have failed to well-plead bad faith.

Thus, even if I were to conclude that Section 365(b)'s safe harbor did not compel dismissal, I would nonetheless almost certainly conclude that Plaintiffs' claim for breach of fiduciary duty against the Special Committee members must be dismissed under both Section 144(a)(1) and MPower's exculpation provision.

## B. Count II: Aiding and Abetting

Plaintiffs' final claim alleges that Tilden Park and King Street aided and abetted the Special Committee members in breaching their fiduciary duties.[113] A predicate breach of fiduciary duty is a necessary element of an aiding and abetting

---

inference of both unfair price and unfair dealing," and "[t]he failure to adequately plead either warrants dismissal") (citing *Monroe Cnty. Emps.' Ret. Sys. v. Carlson*, 2010 WL 2376890, at *2 (del. Ch. June 7, 2010) (dismissing a claim where the plaintiff pled unfair dealing but made no allegations aimed at unfair price)).

[112] Pls. AB at 2, 14–15, 16.

[113] Compl. ¶¶ 26–30.

claim.[114]  Absent an underlying breach of fiduciary duty, the aiding and abetting claim necessarily fails as well.[115]

For the reasons explained above, Plaintiffs failed to plead facts supporting a reasonable inference that the requirements of Section 365(b)'s safe harbor were not satisfied.  As such, no predicate breach has been adequately pled, and the aiding and abetting claim must be dismissed.[116]

## III.    CONCLUSION

For the foregoing reasons, Plaintiffs' claims are dismissed.

---

[114] *In re Alloy, Inc.*, 2011 WL 4863716, at \*14 (Del. Ch. Oct. 13, 2011) ("As a matter of law and logic, there cannot be secondary liability for aiding and abetting an alleged harm in the absence of primary liability.").

[115] *See In re Mindbody, Inc., Stockholder Litig.*, 332 A.3d 349, 389 (Del. 2024) ("The basic four-part test for proving an aiding and abetting claim is well-settled under Delaware law and . . . requires '(1) the existence of a fiduciary relationship, (2) a breach of the fiduciary's duty, . . . (3) knowing participation in that breach by the defendants, and (4) damages proximately caused by the breach.'") (quoting *Malpiede*, 780 A.2d at 1096).

[116] Section 365(b) provides that if its requirements are satisfied, the directors "will be deemed to satisfy [their] fiduciary duties to stockholders and the corporation[.]"  8 *Del. C.* § 365(b).  This plain language is distinct from that used in Section 144's safe harbors and in Section 102(b)(7).  *See id.* § 144(a), (b), and (c) (providing that certain conflicted acts or transactions "may not be the subject of equitable relief, or give rise to an award of damages, against" an alleged fiduciary if one of the safe harbors' requirements are satisfied); *id.* § 102(b)(7) (permitting corporations to include provisions in their charters "eliminating or limiting the personal liability of a director or officer . . . for monetary damages").  This difference in language explains why Section 144's safe harbor and Section 102(b)(7) exculpatory provisions may not extinguish aiding and abetting claims, but Section 365(b)'s safe harbor does. *See* § 144(d)(6)(c); *RBC Cap. Mkts., LLC v. Jervis*, 129 A.3d 816, 874 (Del. 2015) (holding that Section 102(b)(7) exculpation provisions do not extend to aiders and abettors).